1

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ILLINOIS


UNITED STATES of AMERICA    )     18-CR-30031
                            )
                            )
            Plaintiffs,     )
                            )
       Vs.                  )     East St. Louis, Illinois
                            )     December 18, 2018
EVELYN JEAN JOHNSON,        )
                            )
              Defendant,    )


    EXCERPTED TRANSCRIPT OF TRIAL, TESTIMONY OF EVELYN JOHNSON,
           BEFORE THE HONORABLE MICHAEL J. REAGAN,
          UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Plaintiffs:        Assistant U. S. Attorney
                           By:  Norman R. Smith
                           Nine Executive Drive
                           Fairview Heights, Illinois  62298

For the Defendants:        Sandifer Purchase
                           By:  Joslyn R. Anthony
                           7707 West Main Street
                           Belleville, IL  62223

Court Reporter:            Barbara Kniepmann
                           750 Missouri Avenue
                           East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.

2

1              (Whereupon the following proceedings were held in

2      open Court, out of the presence of the jury.)

3              THE COURT:  Do you want to testify in your case, Miss

4      Johnson?  Would you like to testify in your case?

5              MS. ANTHONY:  Yes, sir.

6              THE COURT:  Okay.  So I need you to come up here to

7      the witness stand.  The Marshals will escort you up here and I

8      will bring the jurors out.  I want to do this out of the

9      presence of the jury, okay?  I understand you don't swear,

10     correct?

11             MS. JOHNSON:  I prefer not to, yes, sir.

12             THE COURT:  Will you affirm?  In other words, will

13     you affirm to tell the truth under penalty of perjury?

14             MS. JOHNSON:  Yes.

15                 EVELYN JEAN JOHNSON, DEFENDANT, AFFIRMED

16                          DIRECT EXAMINATION

17             THE COURT:  All right.  So I'll tell the jury she has

18     been sworn.  I don't want them speculating why she didn't take

19     an oath.  That is fine.  You got to tell the truth.  Go ahead

20     and have a seat.  Okay, Jeff, bring them in, please.

21             (Whereupon the following proceedings were held in

22     open Court, in the presence of the jury.)

23             THE COURT:  Ladies and gentlemen, the Government has

24     rested.  Now the defendant is putting on their case.  The

25     witness was already sworn.  We're ready for the defendant's

1    case.

2    Questions By Ms. Anthony:

3    Q.    Miss Johnson, state your name for the record, please.

4    A.    Evelyn Jean Johnson.

5    Q.    Okay.  Prior to this circumstance, how were you

6    employed?

7    A.    Prior to this -- confectionary store and I worked part

8    time for Bi-State.

9    Q.    How long did you work for Bi-State?

10   A.    It wasn't a year.

11   Q.    Okay.  What about your confectionary store?

12   A.    Well, after things started going south, I had to close

13   down.

14   Q.    But prior to that -- I am sorry, can you guys hear Miss

15   Johnson?

16        THE COURT:  Let me see if I can turn the mike up a

17   little bit.

18   A.    Is this better?

19        THE COURT:  Much better.

20   Questions By Ms. Anthony:

21   Q.    What did you do or sell in your confectionary store?

22   A.    I mean candies, cookies, cigarettes, sodas and I

23   started selling little sandwiches to kind of pick up and make

24   more money, but like I say, I didn't own the place.  It was

25   not enough to keep up rent, so I had to close it down.

4

1   Q.      Okay.  Were you a resident of St. Clair County?

2   A.      Yes.

3   Q.      All right.  Do you have any children?

4   A.      I have four, or four biological, and my nephew.

5   Q.      How old is your nephew?

6   A.      He is nine at this time.

7   Q.      Okay.  Your other children, your biological children,

8   are adult children, is that correct?

9   A.      Yes, they are.

10  Q.      During the pendency of both this case and that

11  underlying case -- well, strike that.  During the pendency of

12  the underlying case, were you primarily responsible for your

13  nephew?

14  A.      Yes.

15  Q.      Okay.  Was there any other person you were primarily

16  responsible for?

17  A.      My mother.

18  Q.      Okay.  Now Miss Johnson, you understand the reason why

19  we're in Court today, is that correct?

20  A.      Yes, I do.

21  Q.      All right.  Do you recall on January 29th of this year

22  of 2018 that you were sentenced in an underlying charge, is

23  that correct?

24  A.      Yes.

25  Q.      All right.  What do you recall about your sentence, or

1  what your sentence was?

2  A.      The events during sentencing?

3  Q.      Yes.

4  A.      I was -- know from what the Judge said that she was

5  sentencing me to 18 months.

6  Q.      So you do recall that the Judge said she was going to

7  sentence you to 18 months, is that correct?

8  A.      Yes.

9  Q.      Did she tell you or give you any other information that

10  you could expect with regard to -- strike that.  When she

11  sentenced you, did the Judge require that you remain in

12  custody?

13  A.      No.

14  Q.      Okay.  Do you recall that she indicated that you would

15  be released?

16  A.      I think she called it self surrender.

17  Q.      Okay, self surrender, okay.  Did she tell you to expect

18  or anticipate anything prior to your self surrender?

19  A.      I would like to believe -- I mean the way she was

20  talking that I should have gotten information as to where I

21  was going, especially after she said that -- I know the lawyer

22  recommended me to a certain facility and she made it clear

23  that it was just a recommendation and that I should expect

24  something in the mail as far as -- she was not positive that I

25  would be going there.

1    Q.    Okay.  Miss Johnson, what I am showing you is a copy of

2    the transcript from January 28th.  That is the day you were

3    sentenced, page 37.  I would like you to read lines eight

4    through ten, which is just that one sentence that is there.

5    A.    "If you are allowed to voluntarily surrender, that

6    means you go home today and you will get a letter in the mail

7    as to when and where you are to report."

8    Q.    What did you take that to mean?

9    A.    To expect a letter in the mail to where I needed to go.

10   Q.    Okay.  Now Isaac Huddleston testified that he indicated

11   to you when and where you were to report.  Is that correct?

12   A.    After questioning him, yes.

13   Q.    So let's go back a little bit.  Once you were

14   sentenced, did you follow-up with Isaac Huddleston that day?

15   A.    I did.

16   Q.    Okay.  What did he inform you that day?

17   A.    He informed me that it would be -- I'm not sure, but I

18   know it would be 30 days or more.  He said sometimes it may be

19   up to 60, but whatever the case was, he would have all of the

20   paperwork that I needed and he mentioned that there was

21   paperwork that would need to be signed that he would get it to

22   me and I have to send it back to him after I signed it.  He

23   gave me more paperwork.  I'm not sure, I forget what it was,

24   but it had to do with I guess what goes on inside of a prison.

25   Q.    The ABCs?

1    A.     Right.

2    Q.     So he did tell you what to expect when you got there,

3    is that correct?

4    A.     He gave me the paperwork, yes.

5    Q.     Then he told you to anticipate more paperwork, is that

6    correct?

7    A.     Yes.

8    Q.     Following that conversation, did you proceed home?

9    A.     I would like to assume that I did.

10   Q.     Okay, shortly after?

11   A.     Yes.

12   Q.     You were still on a leg monitor, is that correct?

13   A.     Yes.

14   Q.     You remained on a leg monitor up until the point that

15   you were arrested, is that correct?

16   A.     Yes.

17   Q.     Okay.  Now do you recall exchanging correspondence with

18   Isaac Huddleston via e-mail?

19   A.     I don't believe I have ever exchanged anything.  I sent

20   e-mails.  It may be because I had at one point during the

21   summer I had all of my grandkids with me.  I think that was

22   part of the reason he allowed me to start e-mailing.  I didn't

23   have the proper transportation to get down there at some

24   point.  But anyway, I did start e-mailing.  I don't remember

25   him corresponding back.  The one time, as I was saying -- as a

1    matter of fact, when I sent him all the information about my

2    kids, my grandkids I was home schooling all at the same time.

3    He told me he needed all of that information.  That is why

4    that was in the e-mail.

5    Q.    Okay.  But you don't, as you sit here today, recall his

6    actively sending you e-mail back?

7    A.    I don't believe we -- other than -- I don't ever

8    remember -- we didn't do correspondence back and forth.  It

9    was just me sending him the report.

10   Q.    So then how was the majority of your communication with

11   Isaac Huddleston?

12   A.    Maybe when he did his monthly reports we did a walk

13   through, so between that and me sending him monthly reports,

14   that was basically it.

15   Q.    So you would communicate with him face to face?

16   A.    Uh huh.

17   Q.    And over the telephone?

18   A.    Not over the telephone.

19   Q.    Not over the phone, okay.  Mainly face to face?

20   A.    It was face to face.  Face to face when he came out to

21   the house.

22   Q.    Okay.  Now ultimately Mr. Huddleston indicated that or

23   testified that he, on the day you were to surrender, provided

24   you with paperwork that indicated where you were supposed to

25   go.

1    A.      He probably -- yeah, he brought that letter to me.

2    Q.      Okay.  And did you note to him there was an error on

3    that letter?

4    A.      Yes, I did.

5    Q.      Explain how that conversation went.

6    A.      I was going to go ahead and sign the letter until I

7    noted the mistake on there and through school, everywhere else

8    with the jobs I had, your name have to be right on there.

9    That is not an error you can overlook.  It wasn't my name and

10   I didn't feel comfortable signing it.

11   Q.      Did you articulate to Mr. Huddleston you did not feel

12   comfortable signing it?

13   A.      Yes, I did.

14   Q.      Now there has been a number of different articulations

15   with regard to your position regarding your citizenship, okay?

16   A.      Yes.

17   Q.      My question to you is, do you have trouble or an issue

18   with following the laws of this country?

19   A.      I have never had trouble following the laws.

20   Q.      Okay.  Was it your intent to follow the law here?

21   A.      Yes.

22   Q.      What was the issue that you had with reporting?

23   A.      The law says, from what I understand it, that the

24   notice provided was to be in writing or verbally and in

25   writing.  So -- and from the transcript I was expecting like

1    -- honestly I don't remember what would happen until I read

2    the transcript, but I was supposed to expect it in the mail.

3    Anything legal should have to be on paper and signed and

4    according to the transcript, again, I should have expected

5    that in the mail to show me where to go with the order and

6    indicates that I should have signed that as to let the Judge

7    know, I guess you would get a copy of it back, but have that

8    signed indicating that the probation officer had actually

9    given me all of the copies of the order.

10   Q.      Now your previous interactions with the Court, you at

11   different instances you had signed your signature to different

12   documents, is that correct?

13   A.      Two that I can remember.

14   Q.      Okay.  One was the order setting the conditions of

15   release, is that correct?

16   A.      That was in October of I think 2015, the one initially

17   on initial Court.

18   Q.      That is your signature there, is that correct?

19   A.      That is a copy of my signature.

20   Q.      Copy, I apologize.  Is that a copy of your signature?

21   A.      Yes.

22   Q.      And you were given an oral pronouncement of those

23   conditions, is that correct, or do you recall?

24   A.      I think I do recall the one.  I remember the firearms

25   part so I can say yeah, I had an oral.

11

1    Q.    Then that oral pronouncement was followed by this

2    written writing, is that correct?

3    A.    Yes.

4    Q.    Okay.  So did that kind of set your expectations as to

5    the way information would be given to you?

6    A.    Yes.  I mean that's the only way I expected it to come.

7    Any legal information, any medical information has got to be

8    on paper, so yeah, that's just normal.  Yes.

9    Q.    Okay.  So your expectation was that you receive a

10   writing, is that correct?

11   A.    Yes.

12   Q.    And here were you waiting on a writing?  In this

13   instance with regard to your -- to when and where you were

14   supposed to surrender -- a proper writing of when and where

15   you were supposed to go?

16   A.    Paper copy of the order of surrender, yes.

17   Q.    Okay.  Did Isaac Huddleston ever tell you that you

18   could report to the Bureau of Prisons, or I believe in this

19   instance, Greenville, without that writing?

20   A.    No.

21   Q.    Okay.  What did you believe was the significance of

22   that writing?

23   A.    The significance would be to show -- well, first of

24   all, that I didn't show up just out of the blue, but to give

25   or show evidence that for them that I showed up when I was

12

1    supposed to show up.  I mean me showing up without paperwork

2    is like how do I tell you why I am here.  Other than me

3    supposed to be expecting, you know, paperwork -- like I said,

4    in other words, like I said, copy for my records, copy -- I

5    mean even -- I'm not sure whether I should elaborate or not,

6    but the code say I should have had a copy to take myself to

7    prison to give to the guards.

8    Q.    Miss Johnson, one final question regarding your

9    surrender.  Was it your intent to ignore an order of the

10   Court?

11   A.    I never received the order of the Court.  I thought

12   that's what this was about.  The order of the Court was the

13   paper copy I was expecting to be able to sign.  Like I said,

14   according to the transcripts, no, it wasn't my intent.  Still

15   not my intent.

16             MS. ANTHONY:  Okay, thank you.  No further questions.

17             THE COURT:  Mr. Smith?

18                          CROSS EXAMINATION

19   Questions by Mr. Smith:

20   Q.    Good afternoon.

21   A.    How are you doin'?

22   Q.    Fine.  Have you ever lied in Federal Court under oath?

23   A.    I don't think I have ever been in Federal Court.

24   Q.    Well, you have been in Federal Court a number of times.

25   You were in Federal Court for your prior proceeding, correct?

1   A.      Oh, okay.  I guess I did just lie.

2   Q.      Let me go through it.  In that proceeding you pled

3   guilty to 28 counts of aiding and abetting the false

4   preparation of tax returns, correct?

5   A.      Yes, I did I think, yes.

6   Q.      In that proceeding under oath you told Judge

7   Rosenstengel you would report as directed, did you not?

8   A.      Like I said, I may.  I can't say I didn't.  I don't

9   know.  I know I remember the 18 months, but I don't remember

10  under oath anything else.  I can't say it did.  I don't know.

11  Q.      Do you remember being before Magistrate Judge Proud at

12  the arraignment on the current charges?

13  A.      That was the first day in Court?

14  Q.      It was Magistrate Court.  After you were arrested, you

15  were brought before the U.S. Magistrate Judge.  Do you

16  remember that?

17  A.      Yes, I guess.

18  Q.      March 7th of 2018?

19  A.      Oh, okay.  Yes.

20  Q.      And you will see here where the courtroom deputy asked

21  you to raise your right hand and you were sworn.  Do you see

22  that right there?

23  A.      Yes, I see that.

24  Q.      Do you remember being sworn at your arraignment?

25  A.      I honestly don't.

14

1    Q.      Do you recall promising to tell the truth?

2    A.      I know I -- he actually asked me about -- I remember

3    him asking me about the reading.

4    Q.      At the arraignment were you given a copy of the

5    charges?

6    A.      Yes.

7    Q.      To ask if you understood the charges.  Do you recall

8    that?

9    A.      I don't know.  There was two judges.  There was one

10   judge I went before where you talk about I guess the

11   complaint.  Is this -- there were two judges, so where --

12   Q.      While you were under oath, did you indicate to the

13   Judge you're not the accused, that is not my name?

14   A.      I believe I did.

15   Q.      Again later did you tell the Court you are not that

16   Evelyn Jean Johnson?

17   A.      The proper noun is my name.

18   Q.      Excuse me?

19   A.      You are saying this right here?

20   Q.      That is the transcript.  Do you recall telling the

21   Court while you were under oath that you are not the defendant

22   Evelyn Jean Johnson?

23   A.      Yes.

24   Q.      Isn't that a lie?  Wasn't that a lie to the United

25   States Judge when you told him while you were under oath you

1    are not Evelyn Jean Johnson?

2    A.    The name that is on the Indictment?

3    Q.    Yes, ma'am.

4    A.    Can you turn that?  Is that the Indictment?

5    Q.    No, this is a transcript.  Did you understand you were

6    being accused of failure to surrender for service of sentence?

7    A.    Yes.

8    Q.    Did you persist that you are not the person being

9    accused of a crime?

10   A.    Yes.  In upper case -- can you turn it back for a

11   second?  What is that right there, where it says Mrs. Johnson?

12   Where was that -- yes, right there.  That is what I was

13   talking about.

14   Q.    When you told the Judge while you were under oath that

15   you are not the person being accused of a crime?

16   A.    Yes, sir, I guess.  Yes, sir.

17   Q.    Are you telling the Court and this jury that is not a

18   false statement?

19   A.    That I am not Evelyn Johnson in the upper case, Evelyn

20   Jean Johnson?

21   Q.    I show you Government Exhibit 3.  Do you see the order

22   setting conditions of release?

23   A.    Yes.

24   Q.    You have been shown this before.  Do you see Government

25   Exhibit 3, the order setting conditions of release pertaining

16

1    to Evelyn Jean Johnson?

2    A.      Yes.

3    Q.      Is that in the upper case?

4    A.      Yes, it is.

5    Q.      Is that you?

6    A.      No, it is not.

7    Q.      Well, so you could get out of jail, did you acknowledge

8    and sign those conditions of release as Evelyn Johnson?

9    A.      So I could get out of jail?

10   Q.      Well, in order to get out of jail you have to be

11   released on bond, correct?

12   A.      I hadn't been to jail then.

13   Q.      Well, if you weren't ordered released they were going

14   to keep you.

15   A.      This was October 9th of 2015.

16   Q.      That is your signature?

17   A.      That is a copy of my signature.

18   Q.      All right.  Do you dispute that you signed the

19   original?

20   A.      Do you have the original that I can see?

21   Q.      No, this was filed in the Court.  This is an official

22   document, part of the official record.  Do you dispute that

23   you signed this document, the original, and that is the exact

24   replication, a copy of your signature?

25   A.      No, I don't if that's an exact copy of my signature on

1    that document.

2    Q.     Where it talks about writing.  Do you see Government

3    Exhibit 6?

4    A.     Yes.

5    Q.     All right.  Did you get that e-mail?

6    A.     No, not that I recall.

7    Q.     Oh, you didn't get that e-mail?

8    A.     No.

9    Q.     Oh.  Now let me show you Government Exhibit 5.  Did you

10   get that e-mail the day before?

11   A.     No.  Well, let me rephrase that.  I didn't get it to

12   the point that I opened it and read it then.

13   Q.     So who read it?

14   A.     This seems like we're corresponding.  I didn't, no.

15   Q.     Did you read the e-mail?

16   A.     No, I don't.  I didn't read the e-mail.

17   Q.     So after Isaac Huddleston sent this e-mail, he was

18   finally able to communicate with you on that day and you

19   apologized to him and indicated you had been getting his

20   e-mails and his phone calls?

21          MS. ANTHONY:  Objection, Your Honor.

22          THE COURT:  Wait a minute, I've got an objection.  I

23   have to rule on it.

24          MS. ANTHONY:  He is testifying for the witness.  I

25   don't believe he should testify.

1          MR. SMITH:  I'll rephrase it.

2          THE COURT:  It's cross examination.  Go ahead.

3    Questions By Mr. Smith:

4    Q.     Do you recall Isaac Huddleston's testimony regarding

5    his contact with you by telephone on February 26th?

6    A.     Yes.

7    Q.     After he had sent the e-mail, do you recall advising

8    him that you received phone calls and did not call back

9    because you were asleep?

10   A.     No, I don't.

11   Q.     You don't recall that?  On February 26th do you recall

12   promising to follow the directives of U.S. Probation Officer

13   Huddleston that you would report to the United States Marshal

14   Service the following day?

15   A.     Where are you looking at?

16   Q.     "Defendant noted that she would report to U.S.

17   Probation after meeting with the U.S. Marshal Service.

18   Defendant noted she would report to U.S. Marshal Service

19   tomorrow at 10:00."

20   A.     I didn't send an e-mail with that.

21   Q.     That was a phone call.  It was not an e-mail.  Do you

22   recall promising Isaac Huddleston you would follow his

23   directives and report to the U.S. Marshal Service?

24   A.     Is this about him calling me?  He called me one day

25   about fingerprints and my concern was why would I need to go

1    get fingerprints, we have already done that, and he couldn't

2    answer me.  Otherwise, I don't think so.

3    Q.    So you didn't promise you would go?

4    A.    Promise?  No.

5    Q.    All right.  Did you indicate you would go?

6    A.    I think on the first time he asked me, yes.

7    Q.    Did you go as you indicated that you would?

8    A.    No.  I'm not sure what happened.

9    Q.    On February 27th -- do you see this?   "Defendant

10   advised that she would comply." Do you recall having another

11   conversation on the phone with U.S. Probation Officer Isaac

12   Huddleston that you would comply and go up to the U.S. Marshal

13   Service and Probation?

14   A.    I don't think so.  I think that was on the same day.  I

15   know when it came to plumbing, my water pipes had burst.  So I

16   don't recall it being two separate days.

17   Q.    All right.  Do you recall promising you would comply

18   with the directive?

19   A.    I did not promise.  I had told him -- I mean --

20   Q.    You indicated that you would do it?

21   A.    From the initial call, yes.  He called -- well, no --

22   because he called me asking me about telling me to come in

23   because the marshals needed fingerprints and my question was

24   why do they need fingerprints, but I don't think -- I am

25   pretty sure I didn't tell him I was coming in to do no

20

1    fingerprints but I don't --

2    Q.    While you are on bond, do you think that is your

3    judgment call to be able to ignore a U.S. Probation officer's

4    reasonable directives and say I am not going to comply?

5    A.    They give me directives on paper like I was expecting

6    with a signature that make somebody responsible for requesting

7    -- I got no problem with that.  I never had a problem.

8    Q.    Do you recall when Judge Rosenstengel directed you to

9    be present the morning of the start of trial, do you recall,

10   and you weren't there?

11   A.    I was 15 minutes late.

12   Q.    No, you were not.

13   A.    What do you mean?  It was supposed to be at 9:00

14   o'clock.  I was there at 9:15.  Am I missing something?

15   Q.    Wasn't it late morning?

16   A.    No, it was 9:15.

17   Q.    So you are saying the U.S. District Judge would issue a

18   warrant for arrest, have you arrested, if you were 15 minutes

19   late?

20   A.    I don't know what she would have done, but I am saying

21   I was 15 minutes late.  I was sitting there with my nephew,

22   sitting there waiting and the Marshal come.  It was later that

23   the Marshal came and told me I was under arrest and I asked

24   him why.  He says failure to appear.  Maybe failure to appear,

25   but I asked him about a warrant he said something about

1   getting it later, he didn't have a warrant.  Then I remember

2   something, but, yes.

3   Q.     When the Judge told you to appear, that was an oral

4   pronouncement, wasn't it?  That wasn't in writing?

5   A.     I don't understand oral pronouncement.  All I

6   understand is writing.

7   Q.     You didn't understand when Judge Rosenstengel directed

8   you to appear at the start of trial, the jury trial in that

9   matter, you didn't have to comply because you were going to

10  wait for a letter?

11  A.     No, that's not what I'm sayin'.  I'm sayin' I'm new to

12  this.  That was my first time in trial, so I have a lawyer and

13  as far as I know and understand, that was my lawyer's job to

14  make sure he had everything in order.  I don't know.

15  Q.     Well, it's your job to make sure you follow the Court's

16  directives.

17  A.     Now I understand a little bit.  I didn't understand

18  that then.

19  Q.     You didn't understand that you had to follow the

20  Court's directives?

21  A.     Not if you get a directive through my lawyer.

22  Q.     When the Judge addresses you in Court and tells you to

23  be at Court at 9:00 o'clock for the start of trial, do you

24  think that doesn't pertain to you, that pertains to the

25  lawyer?

1  A.     Okay, I was not late on purpose if that's what you are

2  saying, but I didn't understand that you could not be late.  I

3  later found out no, you cannot be late.  You can call and say

4  I have issues with being there, but you cannot be late.  I

5  didn't understand that.  My lawyer didn't make me understand

6  that.  My lawyer was there.  I wasn't, but he didn't make me

7  understand that being my representative.

8  Q.     It was the lawyers' fault?

9  A.     Yes.

10  Q.     Now do you recall U.S. Probation Officer Isaac

11  Huddleston going to your house in the early morning prior to

12  your report date, your report time?

13  A.     They came to do -- I think it was a walk around that

14  day.

15  Q.     I am sorry?

16  A.     He did his normal reporting thing on that day.

17  Q.     So he came to your house?

18  A.     Yes.

19  Q.     All right.  And you indicated you didn't get the

20  e-mail, correct, directing you to appear at Greenville?

21  A.     Yes, I never read an e-mail.

22  Q.     In fact, wasn't this the location that your lawyer had

23  asked the Court at sentencing to recommend?

24  A.     Yes, I read in the transcript.

25  Q.     You actually got what the Court recommended?

1   A.      What is the question?

2   Q.      Didn't you ask to be placed at the Greenville camp?

3   A.      No, I didn't ask that.  That was the suggestion between

4   my lawyer and the Judge.

5   Q.      You didn't have anything to do with it?

6   A.      I don't have anything to do with that.  I don't know

7   anything about prison to know where to want to go.

8   Q.      And Government Exhibit 7, this is from the Marshal's

9   Service, correct?

10  A.      That is what it says, yes.

11  Q.      So Evelyn Johnson, and that is your address, right?

12  A.      459 -- yes, it was then.

13  Q.      That is the Evelyn Johnson that is you, the Evelyn

14  Johnson, correct?

15  A.      That is me, correct.

16  Q.      Doesn't it say it is hereby ordered that Evelyn

17  Johnson, and your number, the defendant, having been sentenced

18  by the Court, is hereby ordered to surrender to the

19  authorities at Greenville SCP, meaning the camp at the

20  designated address, by Wednesday, February 28th of 2018 by

21  1:00 p.m.?  Doesn't it say that?

22  A.      That is what it is reading, yes.  That is what I would

23  have expected something like that in the mail.  That is

24  something I never got.

25  Q.      So if it is handed to you as opposed to coming in the

24

1    mail, what is the difference?

2    A.    The version that was handed to me right here, that is

3    not my name.

4    Q.    I understand.  That is an acknowledgment.

5    A.    Acknowledgment of what?  That if I don't surrender, if

6    I don't do this then I can be punished?

7    Q.    Well, you actually acknowledged it on February 28th.

8    Didn't you advise U.S. Probation Officer Isaac Huddleston you

9    would surrender to the U.S. Marshal Service at 1:00 p.m.?

10   A.    I didn't acknowledge that letter.

11   Q.    No, it says you were given a copy of the letter.  Did

12   you get a copy of the letter?

13   A.    Yes, I did.

14   Q.    Okay.  Did you advise you would surrender to the United

15   States Marshal Service at 1:00 p.m.?

16   A.    Not that day.  Is this the 28th?  That is when he

17   brought the letter out.

18   Q.    Correct, in the morning.  You were supposed to be there

19   by 1:00, correct?

20   A.    That is what he said.

21   Q.    Well, that is not only what he said, that is what the

22   letter said, that is what the e-mail said, that is what he

23   said over and over since February 8th, is that not correct?

24   A.    So I'm confused right now.

25   Q.    Well did you or did you not tell U.S. Probation Officer

25

1    Isaac Huddleston on the morning of February 28th you would

2    turn yourself in to the United States Marshal's Service?

3    A.    No, I did not.

4    Q.    So you are saying that Isaac Huddleston, U.S. Probation

5    Officer, is wrong?

6    A.    The only discussion there was about the U.S. Marshal

7    Service was about fingerprinting.

8    Q.    You indicated on direct exam you have never had trouble

9    following the law?

10   A.    I don't.

11   Q.    All right.  Did you have trouble following the law when

12   you were preparing false tax returns for various individuals?

13   A.    No, I don't.  As a matter of fact, I was following the

14   law.

15   Q.    Well, okay.  Let's go down that road.  If you were

16   following the law, why did you plead guilty to 28 counts of

17   filing, aiding and abetting in the false preparation of

18   federal tax returns?

19   A.    Because on the morning of my arrest, the morning that I

20   showed up 15 minutes late to Court, I was arrested.  I had my

21   nephew with me.  I had my 88 year old mother at home, which I

22   could not leave at home more than two hours.  She is disabled.

23   Q.    So you are saying you pled guilty not because you were

24   guilty?

25   A.    No, I was arrested that night.

26

1   Q.      Pardon me.  Do you remember at the plea raising your

2   right hand, swearing to tell the truth before a Federal

3   District Judge Rosenstengel, you were under oath and you

4   admitted the allegations in the Indictment under oath?

5   A.      I am not denying that.  I pled guilty.

6   Q.      Was that a lie?

7   A.      But the reason --

8   Q.      Was it a lie when you pled guilty?

9   A.      Under duress, under coercion, yes.  But I don't

10  remember raising my hand.  If I did, that's my fault,

11  whatever.  I take responsibility for that, but --

12  Q.      So it is okay to lie unless you raise your right hand

13  to a Federal District Judge?

14  A.      It is not okay to lie, but again, I had a lawyer that

15  you and Judge Rosenstengel was telling me you have to have a

16  lawyer.

17  Q.      So it is the lawyer's fault you pled guilty?

18  A.      Yeah, basically, because the lawyer should be advising

19  me on what I need to do.

20  Q.      Right.  You are the one that raised your right hand?

21  A.      I raised my right hand and during me pleading guilty to

22  29 counts, neither the Judge nor the lawyer said I didn't have

23  to plead guilty.  They didn't tell me I could have went home

24  and still took care of my parent and my child.  I thought that

25  was the only option for me at that time.  They didn't inform

1    me of the -- I am just as inexperienced as the jury is.  You

2    guys got the experience.  You're using that against me.

3    Q.    Did you promise -- let me do it this way.  Were you on

4    bond following your sentencing?

5    A.    I was told, according to the transcript -- I'm still

6    understanding bond.  The initial bond paper was signed,

7    according to what I just saw, October of 2015.  I had not

8    signed another bond or I see where it changed.  That is the

9    only bond I ever signed.  Apparently I had failure to appear

10   twice, so I don't know how bond works.

11   Q.    So you don't know whether or not you were on bond

12   pending -- following your sentencing, pending your voluntary

13   surrender?

14   A.    I don't know.  I didn't realize anything, like I said,

15   until I got a copy of the transcript.  That was not immediate.

16   I didn't get that until --

17   Q.    Was the fact that the Judge required you to have

18   electronic monitoring while you were at your house a clue that

19   you were on bond?

20   A.    I had been on electronic monitoring since the day after

21   trial.  It just didn't happen just now.  It had been over ten

22   months that I was on electronic monitoring.  I think that

23   happened maybe the time that you are saying I failed to appear

24   when I had my nephew with me.  It was from that point before I

25   even went through trial.  So I mean I don't know what

1   you're --

2   Q.     Do you recall Judge Rosenstengel ordering you to

3   voluntarily surrender as notified?

4   A.     No.  Voluntary surrender as notified?  Yes, as notified

5   by -- I don't know.  I can't say that.  I don't know if that,

6   that read --

7   Q.     There is nowhere in there it says certified letter,

8   does it?

9   A.     Yes, it is.

10  Q.     It says letter.  It doesn't say certified.

11  A.     What letter?  I mean --

12  Q.     You were handed a letter.  You were notified over and

13  over.

14  A.     I got -- I didn't get a letter in the mail.  It did say

15  mail.  Since we're getting technical, it did say mail.  It

16  didn't say just letter and notification, but --

17  Q.     Well, if you didn't believe that you were required to

18  surrender, why did you promise to Isaac Huddleston that you

19  would surrender?

20  A.     I never didn't not believe that I wasn't required to

21  surrender.  I would have surrendered.

22  Q.     Well you told him you were going to report to the U.S.

23  Marshal's Service by 10:00 o'clock on February 28th and you

24  didn't do it.

25  A.     I was told to expect the order where I had to sign and

29

```
1    get it returned and that didn't happen, so that's what I was

2    expecting.

3    Q.     Did you tell Isaac Huddleston that on February 28th?

4    A.     About what?

5    Q.     That you weren't going to report unless you got a

6    different letter.  Did you ever tell him that?

7    A.     Being that is a normal part of your everyday job to --

8    how can I put this.  No, I did not.

9    Q.     You didn't tell him you would surrender?

10   A.     I don't know what I'm doing -- I'm going by what is --

11   Q.     See what's on the screen?

12   A.     Where you at?  Do you see a refuse to sign?

13   Q.     You advised that you would surrender to the U.S.

14   Marshal's Service at 1:00 p.m.?

15   A.     I don't remember that.  I don't remember saying those

16   words.  The last thing I remember was --

17   Q.     So you have no intention -- I am sorry.  Therefore, you

18   had no intention of reporting to the U.S. Marshal's Service on

19   February 28th?

20   A.     I had every intention to report.

21   Q.     I can't hear you.

22   A.     I had every intention of reporting.  You mean to the

23   Marshal?

24   Q.     To the U.S. Marshal's Service as you indicated --

25   A.     Upon notification, proper notification, like I was
```

30

1    expecting, but even with that letter, again, I would have

2    surrendered had he went and got the letter corrected.   I

3    mentioned that to him.

4    Q.    You mentioned that to him?

5    A.    The day he was standing at my door with the letter.

6    Q.    Does it say anywhere in there you mentioned it to him

7    or does it say you promised you would report to the U.S.

8    Marshal?

9    A.    Does it say I promised to report?

10   Q.    Yes, it does.

11   A.    Can I see it again where it says I promised to report,

12   because I didn't promise to report.   I know I didn't actually

13   sign the letter.   That was because, again, my name wasn't

14   there.   I pointed that out to him.   Where does it say promise

15   to report?

16   Q.    You advised that you would surrender to the U.S.

17   Marshal's Service at 1:00 p.m.

18         THE COURT:   Counsel, there were several times she

19   takes issue with the word "promise".

20   Questions By Mr. Smith:

21   Q.    Did you indicate you would report?

22   A.    No.   On that date after that letter I do not recall

23   advising him that I would report.

24         MR. SMITH:   No further questions.

25         THE COURT:   Counsel?

31

REDIRECT EXAMINATION

Questions by Ms. Anthony:

Q.     Now Miss Johnson, you still take issue with the fact that on several Court documents, including the Indictment, your name appears in capital letters, is that correct?

A.     Yes.

Q.     And as you see, your name in capital letters, it is your position that that is not -- that does not properly reflect who you are, is that correct?

A.     That and the two different spellings, yes.

Q.     Okay.  So when you were making articulation to the Court that as you were being shown the Indictment with your name in caps, you were not Evelyn Jean Johnson, was it, in fact, because your name appeared in all caps?  Is that correct?

A.     Yes.

Q.     And that in other instances where you have seen your name with the capital letter first followed by lower case letters, that you have no problem indicating that is indeed you, Evelyn Jean Johnson?

A.     I have no problem.

Q.     So on certain documentation where it shows your name, your first letter of your name in caps, but then the rest in small lettering, you have acknowledged that is indeed you as a proper pronoun, is that correct?

1   A.      Yes.

2   Q.      As you sit here today, you still do take issue with the

3   fact that the Court, even though it may be stylistic, has in

4   some instances placed your name in capital letters, is that

5   correct?

6   A.      Yes.

7   Q.      So when you indicated to the Court at several different

8   proceedings that you were not Evelyn Jean Johnson, is your

9   testimony that you were, in fact, speaking directly to the

10  fact that your name had been appearing in all caps?

11  A.      Yes.

12  Q.      Okay.  So it was not your intent to lie to the Court,

13  is that correct?

14  A.      No, never been.

15  Q.      I want to clear up another matter that was brought up

16  by the prosecutor.  Now at some point you were told by Judge

17  Rosenstengel that you were going to be required to appear for

18  jury trial, is that correct?

19  A.      I was told by --

20  Q.      Judge Rosenstengel that you were going to be required

21  to appear for jury trial.

22  A.      (Inaudible.)

23          COURT REPORTER:  I'm sorry, what was the answer?

24  A.      Can you do it again please?

25  Q.      Yes.  At some point you were informed or told by Judge

33

1    Rosenstengel that you were going to have to appear for jury

2    trial, is that correct, on your underlying case?

3    A.    I cannot say that everything I am recalling is coming

4    through my attorney, so if she said that directly to me I

5    don't remember.

6    Q.    Okay.  At that time were you anticipating or were you

7    -- strike that.  Did Judge Rosenstengel, to your knowledge,

8    tell you, in reference to your underlying trial, tell you to

9    expect or anticipate any mailings?

10   A.    Not that I recall.

11   Q.    Okay.  So in that particular instance the oral

12   pronouncement was sufficient, is that correct?

13   A.    In all honesty, all I can remember from the oral

14   pronouncement is 18 months.

15   Q.    That is in reference to your sentencing.  Now I am

16   referencing the underlying circumstance.  I believe that the

17   Government asked whether or not when you were told you needed

18   to report for trial, you felt as if you had discretion for

19   your underlying case?

20   A.    All other reportings that I have ever seen from my

21   lawyer -- maybe I am confused with the Judge -- I don't

22   believe directly ever told me to show up for trial.

23   Everything was at that point done through my lawyer.

24   Q.    Okay.  The information provided by your lawyer in those

25   instances though you took as being sufficient, is that

1    correct?

2    A.      Yes.

3    Q.      And in this particular instance after you had been

4    sentenced, the Judge gave an oral pronouncement, is that

5    correct?

6    A.      The sentence?

7    Q.      The sentence.

8    A.      Yes.

9    Q.      But then also told you to anticipate a letter in the

10   mail, is that correct?

11   A.      I cannot say I remember that standing in front of her.

12   I remember it from the transcript.  The information that I was

13   to expect in the mail came.  She did -- I do remember her

14   telling me to report to PO, to the probation office.  As far

15   as I remember, that information came from him, that I was

16   supposed to get information, get it signed, and get it back to

17   him.

18   Q.      Okay.  Did that create the expectation that you had for

19   mailings?

20   A.      Yes.

21   Q.      There also has been -- you also had some questions with

22   regard to being on release versus being on bond.  At the time

23   or following your sentence, what was your understanding of how

24   you were being released?

25   A.      There was no understanding.  I still don't recall her

1    saying I am released on bond.  Again, the bond paperwork was

2    signed in 2015.  I am not understanding how bond work.  It

3    says failure to appear, and I have been accused of failure to

4    appear twice, so I don't know if that exhausts the bond, but I

5    have also been under pre-trial from this point, so I am just

6    starting to learn, kind of understand what is going on.  I

7    have no idea.

8    Q.     You didn't have a cognitive or independent

9    understanding as to whether or not you were on release or bond

10   at the time of your sentencing?

11   A.     The only time that I knew I was on bond was when I

12   initially signed the bond paperwork.  If I remember correctly,

13   it may have been for $5,000.  I don't know.  I am not sure of

14   all the information they had on there.  I don't know that

15   because it has been that long possibly since I have looked at

16   the original paperwork.  Other than that, all I seen was

17   copies of that.  I haven't seen anything with the original

18   paperwork.  That is the only thing I know that I had to sign

19   was that one time aside from signing a waiver at sentencing.

20   Q.     Lastly, when Isaac Huddleston provided you with the

21   mailing on February 28th -- strike that.  Prior to that, had

22   Isaac Huddleston to your knowledge provided you with any other

23   writings to denote where you were supposed to go and when you

24   were supposed to report?

25   A.     No.

36

1          MS. ANTHONY:  No further questions, Your Honor.

2          THE COURT:  Recross Mr. Smith?

3                    RECROSS EXAMINATION

4    Questions by Mr. Smith:

5    Q.     Miss Johnson, on redirect you were asked questions

6    about whether your name should be capital or lower case and

7    whether you are Evelyn Johnson capital letters or lower case

8    letters.  Do you remember that?

9    A.     Yes.

10   Q.     All right.  You take exception when your name is in

11   upper case, correct?  You said you are not Evelyn Johnson if

12   it is all caps?

13   A.     Because my name -- anybody name, from what I understand

14   as law, anybody name in all caps equals to what they call a

15   vessel, a ship.  In school we were all taught our names are

16   proper nouns.  Our names start with a capital letter and lower

17   case, so I mean --

18   Q.     Government Exhibit 12, the Affidavit of Truth that you

19   filed?

20   A.     Yes.

21   Q.     Didn't you style it all capital letters?

22   A.     Where?

23   Q.     United States of America versus Evelyn Johnson filed

24   January 22nd of 2016?

25   A.     Hmm, okay.

37

1  Q.     Signed by Evelyn Johnson.  You put all caps?

2  A.     I did do that.  I believe I did that.  Again, being

3  young at Court proceedings.

4         MR. SMITH:  I have nothing further, Your Honor.

5         THE COURT:  Miss Anthony?

6                    RE-DIRECT EXAMINATION

7  Questions by Ms. Anthony:

8  Q.     Just a point of clarification.  When you were answering

9  to the Judge in those other proceedings with regard to whether

10  or not you were Evelyn Jean Johnson, it was specifically

11  because you saw your name in all caps?

12  A.     Yes.

13         MS. ANTHONY:  No further questions.

14         THE COURT:  Okay, folks, let's take about a 15-minute

15  break.  We'll do some legal stuff.

16

17

18

19

20

21         I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24  SS/Barbara Kniepmann                    January 27, 2019

25

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

1                            I N D E X

2

3                                                   PAGE  LINE

4    EVELYN JEAN JOHNSON

5         DIRECT EXAMINATION                         2    16

6         CROSS EXAMINATION                          12   18

7         REDIRECT EXAMINATION                       31   1

8         RECROSS EXAMINATION                        36   3

9         RE-DIRECT EXAMINATION                      37   6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25